**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------X
SHELLYNE RODRIGUEZ

                                          Plaintiff,

         -against-                                          **FIRST AMENDED**
                                                            **COMPLAINT**

THE CITY OF NEW YORK; NEW YORK CITY MAYOR                   **Case No. 21-cv 10815(PKC)(VF)**
BILL DE BLASIO; NEW YORK POLICE DEPARTMENT
("NYPD") COMMISSIONER DERMOT SHEA; NYPD
CHIEF OF DEPARTMENT TERENCE MONAHAN; NYPD
ASSISTANT CHIEF KENNETH LEHR; NYPD LEGAL
BUREAU SERGEANT KENNETH RICE; NYPD OFFICER
KHALID KHACHFE; NYPD OFFICER FIRST NAME
UNKNOWN ("FNU") DORCH; NYPD OFFICER RAUL
FLORES; NYPD DETECTIVE NELSON NIN; NYPD
DETECTIVE DONALD SEHL; NYPD DETECTIVE
NOELLE CUNNINGHAM; and NYPD MEMBERS JOHN
AND JANE DOES # 1-80, 84-85,

                                          Defendants.

--------------------------------------------------------------------------X

         Plaintiff SHELLYNE RODRIGUEZ, by her attorneys, COHEN&GREEN P.L.L.C. and

Gideon Orion Oliver, hereby complain of Defendants as follows:

                            **PRELIMINARY STATEMENT**

         1.      On May 25, 2020, police in Minneapolis, MN, murdered George Floyd. Almost

immediately, mass protests against police violence and in support of police accountability began

nationwide. These protests, including those organized by those in the Black Lives Matter

movement and others, spread across the United States and the world, including here in New

York City where thousands exercised their constitutional rights to protest.

         2.      In the days, weeks, and months following Mr. Floyd's murder, the New York City

Police Department ("NYPD") deliberately engaged in activities that violated the constitutional

rights of individuals who were protesting police misconduct, and those who sought to bear

witness, including, *inter alia*, corralling protesters and observers into spaces where they could not escape (or, "kettling"), beating protestors with batons and fists, throwing protestors to the ground, kneeling on the protestors backs, necks, and other parts of their bodies, using pepper spray indiscriminately, slamming protesters with bikes, using excessive force, failing to intervene, stop, or mitigate the excessive use of force all of which ultimately resulting in injuring and arresting many of the protestors without lawful justification.

3.      All of this occurred at — and was exemplified by  — a brutal NYPD enforcement action targeting a "FTP4" protest in the Mott Haven area of the Bronx, on June 4, 2020 (the "FTP4 Protest" or the "Mott Haven Protest").

4.      "FTP" stands for many things, including "Free the People," "Feed the People," and, in the context of certain anti-police protests, "Fuck the Police."

5.      Prior to the June 4, 2020 FTP4 Protest, Defendants Shea, Monahan, Lehr, and other NYPD members and representatives of Defendant City who were involved in planning the police response to the FTP4 Protest knew that protesters planned to gather at the Hub at 149th Street and 3rd Avenue in the Bronx and march through the Mott Haven streets participating in the protest.

6.      Rather than planning to escort and facilitate the FTP4 Protest, those Defendants devised, and Defendants Monahan, Lehr, and other NYPD members under their command, executed, a brutal trap for and assault on the protesters.

7.      For example, upon information and belief, Defendants Monahan and Lehr, along with other high-level NYPD policymakers who were involved in the police response to the FTP4 Protest, planned to utilize police resources including NYPD Strategic Response Group ("SRG") members in riot gear, some of whom were on bicycles, to trap, then physically brutalize and

arrest, FTP4 Protest attendees, without first having given them notice or an opportunity to disperse - let alone a meaningful one.

8.     Upon information and belief, the Defendant City officials who were involved in deciding how the NYPD would respond to the FTP4 Protest devised, and other NYPD members (including other Defendants) executed, that brutal assault based on the "anti-police rhetoric" of the FTP4 protesters.

9.     For example, at a press conference shortly before the FTP4 Protest on June 4, 2020, Defendant Shea said that the "anti-police rhetoric disgusts me to my core."[1]

10.     Over the course of the next several hours after that, as described more fully below, NYPD members - including the other individual Defendants – under the command and supervision of Defendants Monahan and Lehr, among other NYPD supervisors, trapped, brutalized, and arrested Plaintiffs and other FTP4 Protest participants.

11.     With an 8:00 p.m. curfew - requiring orders to disperse and opportunities to comply with them before any enforcement action could be taken - in place, at around 7:45 p.m., NYPD members kettled and trapped Plaintiffs[2] and other protesters with lines of police blocking any possible escape.

12.     The NYPD then played nominal orders to disperse for show, but refused to allow them to leave — even as they chanted "let us go."

---

[1] https://twitter.com/NYPDnews/status/1268660244323983361
[2] This complaint was initially filed with three Plaintiffs.  While only one Plaintiff remains now, given the detail needed to plead (among other things) *Monell* claims in the Second Circuit, this complaint is extensive.  In light of the limitations on what work is reasonably compensable pursuant to 42 U.S.C. § 1988, Plaintiff has not reworked the entire complaint to be singular (and a simple find/replace would be ineffective because of verb agreement).  Instead, for the purposes of this complaint, it should be understood that where the complaint says "Plaintiffs," that is intended to only refer to Plaintiff.

13.     At around 8:00 p.m., the police then began a brutal physical assault on the protesters, beating them with fists, batons, and bicycles, deploying pepper spray, and employing similar violence.

14.     Past there, the NYPD engaged in long-standing, unconstitutional arrest processing tactics, ranging from wildly overtight handcuffs, to refusing to release protesters with summonses on the street in order to deter further protesting.

15.     For example, NYPD members physically restrained Plaintiffs and around 250 other arrestees with flex-cuffs in a way that caused them unnecessary pain and suffering and, in some cases, injuries, including serious and long-term nerve damage — and refused to remove obviously overtight cuffs, or were unable to because they were not issued the proper equipment.

16.     Then, rather than releasing Plaintiffs and other arrestees from the street as the New York State Criminal Procedure Law § 150.20, NYPD members subjected Plaintiffs and other arrestees to lengthy and unnecessary custodial arrest processing and detention that confined them in dangerously close quarters for hours, all at the height of the global COVID-19 pandemic.

17.     The morning after the Mott Haven Protest, Defendant Shea ratified the misconduct that occurred in the NYPD's assault on the FTP4 Protest when he said the NYPD "had a plan which was executed nearly flawlessly in the Bronx." [3]

18.     Similarly, Defendant de Blasio ratified the misconduct that occurred in the NYPD's assault on the FTP4 Protest when he said that "what happened in Mott Haven…is something that the NYPD saw coming" on June 5, 2020[4] and when he bragged on June 7, 2020

---

[3] Jake Offenhartz, Nick Pinto, and Gwynne Hogan, "NYPD's Ambush of Peaceful Bronx Protestors Was "Executed Nearly Flawlessly," City Leaders Agree," *Gothamist*, June 5, 2020, *available online at* https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree.
[4] *See* Transcript: Mayor de Blasio Holds Media Availability, June 5, 2020, *available online at* https://www1.nyc.gov/office-of-the-mayor/news/410-20/transcript-mayor-de-blasio-holds-media-availability.

that he had "approved the broad strategies" that the NYPD deployed "and sometimes [their] very specific choices" made in terms of the police responses to the Summer 2020 Protests, including the FTP4 Protest.[5]

19.     Plaintiffs now sue seeking some transparency around, and redress for, Defendants' misconduct.

## JURISDICTION

20.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

21.     The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

22.     The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65 authorize this Court to grant Plaintiffs the declaratory and injunctive relief they pray for herein.

23.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## VENUE

24.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

## GENERAL MUNICIPAL LAW COMPLIANCE

---

[5] *See* Transcript: Mayor de Blasio Holds Media Availability, June 7, 2020, *available online at*
https://www1.nyc.gov/office-of-the-mayor/news/413-20/transcript-mayor-de-blasio-holds-media-availability.

25.     All Plaintiffs timely served Notices of Claim on the municipal Defendant and complied with all conditions precedent to commencing an action under state law.

26.     At least thirty days have elapsed since service of Plaintiffs' Notices of Claim and adjustment and payment thereof has been neglected or refused.

27.     Plaintiffs have initiated this action within one year and ninety days of the accrual of Plaintiffs' claims pursuant to New York State Law.

## PARTIES

28.     At all times mentioned herein, Plaintiff Shellyne Rodriguez (Ms. Rodriguez; she/her) was a resident of Bronx County in the City and State of New York.

29.     At all relevant times mentioned herein, Defendant City of New York ("New York City" or "NYC") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the NYPD and their employees.

30.     Defendant New York City Mayor BILL DE BLASIO was at all times relevant to this Complaint, and still is, the Mayor of New York City. As Mayor, Defendant de Blasio, at all relevant times, was and is an elected officer and the "chief executive officer of the city," NYC Charter Section 3, who was "responsible for the effectiveness and integrity of city government operations," NYC Charter Section 8, and had final authority to appoint and/or remove the New York City Police Commissioner, NYC Charter Section 431. He is sued individually and in his official capacity.

31.     Defendant NYPD Commissioner DERMOT SHEA was at all times relevant to this Complaint, and still is, the Police Commissioner of the NYPD. As Police Commissioner and the "head," NYC Charter Section 8, and "chief executive officer of the police force", NYC Charter Section 434, Defendant Shea, personally and/or through his authorized delegates, at all

relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. NYC Charter Section 434. He is sued individually and in his official capacity.

32.     Defendant former NYPD Chief of Department TERENCE MONAHAN was at all times relevant to this Complaint the Chief of Department of the NYPD who has policymaking authority over the Department. At all relevant times, as Chief of Department, Defendant Monahan, had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him. Additionally, Defendant Monahan was the incident commander (meaning the highest ranking NYPD officer at the scene) at Mott Haven, and personally commanded the NYPD enforcement action at Mott Haven. He is sued individually and in his official capacity.

33.     Defendant Assistant Chief KENNETH LEHR was at all relevant times set forth herein the Commander of Patrol Borough Bronx. Upon information and belief, Lehr was present, and directed/authorized the command, strategy tactics, and oversight, supervision, of the officers present at the Mott Haven protest and of the arrest of those individuals who participated in the Mott Haven protest, including Plaintiffs herein. All NYPD members under his command were required to follow his orders. He is sued individually and in his official capacity.

34.     Defendant NYPD Legal Bureau Sergeant KENNETH RICE at all relevant times set forth herein a NYPD Legal Bureau attorney on the scene of the FTP4 Protest who was, upon information and belief, involved in planning for, deploying, and/or supervising the deployment

of the Mott Haven Kettle and other acts and omissions that are the subjects of Plaintiffs'

complaint. NYPD Patrol Guide § 212-20 provides that, if a NYPD Legal Bureau attorney gives

advice to any NYPD member of any rank, the NYPD member "MUST FOLLOW THE

DEPARTMENT ATTORNEY'S ADVICE" and warns: "Members of the service (uniformed and

civilian) should be aware that in disregarding legal advice offered by Department attorneys, they

may be subject to disciplinary action and civil liability."

35.    At all times hereinafter mentioned, Defendants NYPD Officer Khalid Khachfe

(Shield # 22929, Tax Registration #962523, Command 076) Defendant NYPD Officer First

Name Unknown ("FNU") Dorch (Tax Registration No. 938388, Command 730); NYPD Officer

Raul Flores (Tax Registration No. 94014); NYPD Detective Nelson Nin; Detective Donald Sehl;

Detective Noelle Cunningham; NYPD Members John and Jane Does 1-20 (the "Brook Avenue

Line Does"); NYPD Members John and Jane Does 21-40 (the "Brown Place Does"); NYPD

Members John and Jane Does 41-60 (the "Sidewalk Lines Does"); NYPD Supervisors John and

Jane Does 61-80 (the "NYPD Supervisor Does"); and NYPD Members John or Jane Does 84-85

were NYPD members who violated Plaintiffs' rights, as set forth more fully below.

36.    Defendants Detective Donald Sehl, Detective Noelle Cunningham, NYPD

Detective Nelson Nin and Does 84- 85 are NYPD members who participated in the arrest and

assault of Ms. Rodriguez, who had their badge numbers covered. Of those, Defendant Doe 84

appeared to be a white male in a blue NYPD uniform.

37.    The numbered Doe Defendants are members of the NYPD whose names are

currently unknown to Plaintiffs.

38.    At all times hereinafter mentioned, Defendants were employed by the City of

New York as members of the NYPD.

39.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

40.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

41.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

42.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

43.     At all times relevant herein, and as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

44.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

## STATEMENT OF FACTS

45.     The City's and NYPD's responses to the summer 2020 Black Lives Matter protests (the "Summer 2020 Protests") in general, and the June 4, 2020 FTP4 protest in particular, were the subject of broad public scrutiny as they unfolded and have since given rise to substantial litigation in federal and state courts as well as investigations by non-governmental entities the New York State Attorney General, the New York City Council, and other governmental agencies.

46.     Plaintiffs incorporate by reference the facts contained in the governmental reports that have been issued concerning Defendants' responses to the Summer 2020 Protests, including the reports issued by the New York State Office of the Attorney General[6], the New York City Office of the Corporation Counsel[7], and the New York City Department of Investigation.[8]

47.     Plaintiffs further incorporate by reference the facts contain in the reports that have been issued by non-governmental agencies concerning Defendants' responses to the FTP4 protest, including, but not limited to, the September 2020 Human Rights Watch written analysis of the NYPD's response to the Mott Haven Protest (the "HRW Report")[9] and video report[10], and the Physicians for Human Rights reports: "'A Targeted Attack on the Bronx' - Police Violence

---

[6] Letitia James, Attorney General, State of New York, *Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd,* available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.

[7] Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

[8] New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), available at https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

[9] Human Rights Watch, "Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States ("HRW Report"), Sept. 2020, *available at* https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.

[10] Human Rights Watch, "NYPD Beat and Arrest Peaceful Protesters in Planned Assault," Sept. 2020, *available at* https://www.youtube.com/watch?v=ovsQoElXzl8.

and Arrests of Health Workers at a New York City Protest"[11] and "Expert Statement on Individual and Community Effects from Trauma Due to NYPD Use of Force in Response to the Mott Haven  Protest on June 4, 2020."[12]

48.     Plaintiffs also incorporate by reference the factual allegations set forth in other federal civil rights complaints in cases pending in the United States District Court for the Eastern District of New York arising from Defendants' responses to the Summer 2020 Protests that support Plaintiff's claims against Defendants in this case, including:

      a.  *Ezagui v. City of New York et al.*, 20-cv-06360 (DG)(SJB);

      b.  *Fraser v. City of New York et al.*, 20-cv-05741 (NGG)(MMH);

      c.  *Gelbard et al. v. City of New York et al*, 20-cv-03163(MKB)(RER);

      d.  *Jefferey et al. v. City of New York et al.*, 20-cv-02843 (NGG)(RML);

      e.  *Richardson and Myrie v. City of New York et al*., 21-cv-03609 (LDH)(SJB);

      f.   *Smith v. City of New York et al*., 21-cv-03096 (DG)(TAM); and

      g.  *Zayer v. City of New York et al.*, 20-cv-06070 (ARR)(PK).

49.     Plaintiffs incorporate by reference the factual allegations set forth in other federal civil rights complaints in cases pending in the United States District Court for the Southern District of New York arising from Defendants' responses to the Summer 2020 Protests that support Plaintiff's claims against Defendants in this case, including:

      h.  *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

      i.   *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG);

      j.   *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

---

[11] Phelim Kine and Joanna Naples-Mitchell, September 2020, *available online at* https://phr.org/wp-content/uploads/2020/09/A-Targeted-Attack-on-the-Bronx_Police-Violence_Sept-2020.pdf.

[12] Michele Heisler, et al., April 2021, *available online at*  https://phr.org/wp-content/uploads/2021/04/PHR-Mott-Haven-Protest-Expert-Statement-April-2021.pdf.

k.   *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

l.   *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

m.   *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

n.   *Campbell v. City of New York,* 21-cv-04056 (AJN); and

o.   *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG).

**A.   Defendant de Blasio issues Curfew Orders in New York City, and the NYPD Directs Officers to Implement the Curfew Orders Incorrectly and Illegally.**

50.   Prior to June 4, 2020, Defendant de Blasio had issued several emergency executive orders related to "the presence of Covid-19 in the city."

51.   The first Emergency Executive Order (Executive Order No 98) was issued on March 12, 2020, and was extended by Emergency Executive Order No 112 on May 9, 2020.

52.   On June 1, 2020, Defendant de Blasio issued Emergency Executive Order 117, citing an alleged escalation of protest activity to include acts of assault, vandalism, property damage and/or looting (at unspecified dates, times and/or locations) and enacting a city-wide curfew beginning at 11:00 p.m. on June 1, 2020 until 5:00 a.m. on June 2, 2020.[13]

53.   Then, Mayor de Blasio issued Emergency Executive Order 118, ordering a city-wide curfew from 8:00 p.m. on June 2, 2020 until 5:00 a.m. on June 3, 2020.[14]

54.   And building on that, Defendant de Blasio finally issued Emergency Executive Order 119, ordering a city-wide curfew from June 3, 2020 to June 8, 2020 between the hours of 8:00 p.m. and 5:00 a.m.[15]

---

[13] *See* Emergency Executive Order No. 117, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-117.pdf.

[14] *See, e.g.,* https://twitter.com/NYCMayor/status/1267642422194057217?s=20; Emergency Executive Order No. 118, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-118.pdf.

[15] *See* Emergency Executive Order No. 119, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-119.pdf.

55.     That curfew — from 8:00 p.m. to 5:00 a.m. — was in effect on June 4 when the FTP4 Protest took place.

56.     By the terms of Emergency Executive Orders 117, 118 and 119 (collectively, the "Curfew Orders"), "a failure to comply with the Order[s] shall result ***in orders to disperse***" (emphasis added).[16]

57.     The Curfew Orders also provided that "any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor" under NYC Administrative Code ("AC") § 3-108.

58.     AC § 3-108 contains a knowing intent requirement: "Any knowing violation of a provision of any emergency measure established pursuant to this chapter shall be a class B misdemeanor punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than three months, or both."

59.     Under New York Penal Law ("PL") § 15.05, "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists."

60.     As the plain text of the Curfew Orders, AC § 3-108, and PL § 15.05 make clear, a violation of the Curfew Orders could not have occurred unless the alleged violator had received an audible order to disperse, along with an appropriate opportunity to disperse, and had refused to leave.

61.     As the plain text of the Curfew Orders, AC § 3-108, and PL § 15.05 also make clear, there would be no probable cause to arrest an alleged violator unless the alleged violator

---

[16] E.O. 117 technically had a typo, stating "[f]ailure to comply with this Order shall result in orders to disburse." That typo was corrected in the subsequent Curfew Orders.

had received an audible order to disperse, along with an appropriate opportunity to disperse, and had refused to leave.

62.    The NYPD issued two official statements directing officers how to implement the Curfew Orders, through the FINEST message system (which sends internal messages to NYPD members).

63.    First, on July 1, the NYPD Operations Division used the FINEST system to instruct officers that "[curfew e]nforcement will only be taken after *several* warnings are issued *and* the violator is refusing to comply" (emphasis added).[17]

64.    However, in a FINEST message sent June 3, the NYPD Operations Division omitted any reference to warnings or orders to disperse, directing simply that "[i]f [members of the service] observe a person violating the curfew, a C-Summons may be issued for Admin. Code 3-108, Violating a Mayoral Emergency Order."[18]

65.    Thus, at the June 4 protest, the official policy of NYPD and the City of New York was that orders to disperse and opportunities to comply were not required before arrests for alleged Curfew Orders violations could be made — and that the simple fact that protesters were out past 8:00 p.m. on June 4 at Mott Haven (having been trapped there by NYPD) was sufficient cause for using force on, arresting, and prosecuting them.

**B.    NYPD Kettles and Suppresses the FTP4 Protest at Mott Haven.**

66.    On June 4, 2020, Plaintiffs attended and participated in the FTP4 Protest.

67.    That evening, NYPD members apparently escorted, acquiesced in, and/or facilitated a demonstration and march that began around "The Hub" at 149th Street and 3rd

---

[17] NYPD Finest Message, *City-Wide Curfew* (June 1, 2020).
[18] NYPD Finest Message, *Curfew Extension* (June 3, 2020).

Avenue and continued through the Mott Haven streets, eventually proceeding south on Willis Avenue toward the Willis Avenue Bridge.

68.     The Hub is one of the "most dynamic commercial centers" in the Bronx and has been called "the Times Square of the Bronx."[19] The description is apt for the geographic configuration of The Hub, which is formed by the intersection of East 149th Street and Willis, Melrose, and Third Avenues.

69.     Most of the protestors initially met at The Hub located at 149th Street in Bronx County, at or around 6:00 p.m.

70.     Among the purposes of the June 4th rally were to demand racial justice and accountability for police violence against Black people and people of color. The protesters chanted "I can't breathe" – the last words of George Floyd and of Eric Garner, who was killed by an NYPD officer – and other messages critical of the NYPD.

71.     The protesters left The Hub and marched through the Mott Haven neighborhood.

72.     In an effort to suppress the Mott Haven protesters' message and to intimidate them, Defendants executed their planned operation to corral, or "kettle," the protesters, assault them, and arrest them.

73.     Defendants' plan for the June 4th Mott Haven protest was to instill fear in the protesters and others who might join them in future protests.

74.     From the outset, there was a large police presence surrounding The Hub, with officers placed on rooftops, near subways, and many were dressed in full riot gear, including Kevlar vests, helmets and forearm plutes.

---

[19] Alison Gregor, *People, Shops and Roads Converge Here*, N.Y. TIMES (June 8, 2012)

75.     As protesters began marching down Third Avenue, NYPD officers accompanied them and followed them the entire time.

76.     The march itself proceeded with little or no interaction with the NYPD as it made its way toward East 136th Street.

77.     The march continued through the grounds of the Patterson Houses, a public housing project whose residents are primarily people of color. Residents voiced their support for the protesters' message: some leaned out their windows banging pots and pans.

78.     The march continued south on Willis Avenue, still accompanied by police. At various times, protesters chanted slogans expressing their anger over the conduct of the NYPD in their community. Police officers halted vehicular traffic on cross streets.

79.     At some time before 8:00 p.m. (upon information and belief, several minutes before 7:45 p.m.), NYPD Strategic Response Group officers wearing dark padding or body armor and bike helmets formed a line with their bodies and NYPD bicycles at 135th Street and Willis Avenue, causing the protesters to turn left (east) onto 136th Street.

80.     At around the same time and/or as the protesters proceeded east on 136th Street, Defendants NYPD Members John and Jane Does 1-20 (the "Brook Avenue Line Does") formed a police blockade ahead of, and downhill from, the protesters, on 136th Street at Brook Avenue (the "Brook Avenue Line").

81.     As protesters arrived on the 136th Street block between Brown Place (on the west) and Brook Avenue (on the east, downhill), they encountered the Brook Avenue Line.

82.     At around the same time as the protesters encountered the Brook Avenue Line, Defendants NYPD Members John and Jane Does 21-40 (the "Brown Place Does") formed a second police blockade on 136th Street and Brown Place (the "Brown Place Line").

83.     Also at around the same time, a third group of Defendants NYPD Members John and Jane Does 41-60 (the "Sidewalk Lines Does") formed a third police blockade between the 136th Street roadway and the sidewalks to the north and south of 136th Street (the "Sidewalk Lines"), effectively preventing people trapped on the roadway between the Brook Avenue Line and the Brown Place Line from going onto the sidewalk, and people trapped on the sidewalk from entering the roadway.

84.     The Brook Avenue Line Does, Brown Place Does, and Sidewalk Line Does formed a police trap or "kettle" from which protesters, including Plaintiffs (as described in more detail below) could not leave – the "Mott Haven Kettle."

85.     At no time – from when the protesters gathered at The Hub until they were kettled on East 136th Street – did any NYPD officer order the protesters to disperse.

86.     On the contrary, the police escorted the protesters on the entire march from The Hub to East 136th Street, and stopped vehicular traffic on cross streets to permit the march to proceed safely.

87.     Once the Mott Haven Kettle was formed, NYPD members did not permit those within the kettle who were not NYPD members to leave the kettle.

88.     As the protesters were held in the kettle, they asked NYPD officers to allow them to leave, and chanted "Let us go, let us go."

89.     The NYPD did not permit protesters to leave the kettle.

90.     With the protesters trapped, the NYPD launched the next phase of its plan.

91.     The back and front lines of Mott Haven Kettle (that is, the Brown Place Line and the Brook Avenue Line) pressed in, pushing the protesters tightly together — condensing the Mott Haven Kettle in space, while paradoxically demanding protesters directly in front of the

Brook Avenue Line "move back" into the part of the crowd being pressed forward by the Brown Place Line.

92.      Once police formed the Mott Haven Kettle, NYPD members began to grab and handcuff arrestees, in some cases shoving, grabbing, and/or beating trapped protesters.

93.      Defendant Monahan, the NYPD's highest-ranking uniformed member, was present supervising and directing police actions at the Mott Haven Kettle scene.

94.      Upon information and belief, Monahan acted as NYPD "Incident Commander" within the meaning of NYPD Patrol Guide (the person "responsible for the command, control and coordination of all incident operations") with respect to, and/or otherwise planned and/or supervised the deployment of, the Mott Haven Kettle.

95.      Defendant Lehr, Commanding Officer of the Patrol Borough Bronx, was present supervising and directing police actions at the Mott Haven Kettle scene.

96.      Defendant Rice was also present giving advice related to, supervising, and directing police actions at the Mott Haven Kettle scene.

97.      Defendants NYPD Supervisors John and Jane Does 61-80 (the "NYPD Supervisor Does") are NYPD members of the rank Sergeant and above who were other supervisors involved in planning for, deploying, and/or supervising the deployment of the Mott Haven Kettle.

98.      Defendants Monahan, Lehr, Rice, the NYPD Supervisor Does, the Brook Avenue Line Does, Brown Place Does, Sidewalk Line Does, and other NYPD members, including the other NYPD members discussed or described below, detained and arrested Plaintiffs and other arrestees in the Mott Haven Kettle on 136th Street between Brook Avenue and Brown Place.

99.     Additionally, upon information and belief, Defendant Monahan and other NYPD members were involved in planning for, supervising, and/or deploying the large-scale arrest processing procedures to which Plaintiffs were subjected based on their arrest at a protest, also mentioned below, including the decisions not to issue Plaintiffs summonses on the street and instead to subject Plaintiffs to unduly lengthy, and unsafe, mass arrest processing.

100.    And beyond that, since June 4, 2020, Defendants de Blasio, Shea, Monahan, Lehr, their subordinates, and other Defendant City representatives, have failed to train, investigate, supervise, or discipline any of the involved NYPD members in a meaningful way.

101.    To the contrary, Defendants de Blasio, Shea, and Monahan have publicly applauded each other in connection with, and otherwise justified and defended, the entire police operation.

102.    Upon information and belief, this "kettle" was fully formed by the Defendants at approximately 7:45 p.m., trapping most of the protestors inside.

103.    Thus, protesters were unable to comply with the nominal orders to disperse the NYPD gave after the trap had already been sprung.

104.    No NYPD member had individualized probable cause to arrest any Plaintiff.

105.    Just after 8:00, a brutal assault began.

106.    Police officers with batons and shields struck people at the edge of the encircled group, thrust raised bicycles into trapped protesters, and indiscriminately sprayed them with pepper spray.

107.    In some instances, officers pulled down protesters' COVID-protective face masks and pulled up face shields to pepper spray protesters directly in the face.

108.    The protesters had committed no acts of violence or resistance that would justify this excessive and unreasonable use of force.

109.    Many protesters were left injured and bleeding. Some protesters fainted, or lost consciousness and went into convulsions.

110.    Defendant Monahan personally ordered the arrest of one of the organizers and leaders of the protest — Shellyne Rodriguez — who was committing no offense and was engaged in protected speech at the very moment he ordered officers to arrest her.

111.    Despite their unambiguous status as essential workers exempt from the curfew, along with the fact that they were carrying communications showing Defendant de Blasio had said as much, volunteer medics and National Lawyers Guild – NYC Chapter Legal Observers were arrested.

112.    Upon information and belief, the purpose of arresting such workers was to ensure that medical care was denied to injured protesters to further the deterrent effect of the crackdown, and to prevent people like Plaintiffs from having documentation of exactly what happened, and which officers harmed them.

113.    Individuals who happened to be in the vicinity of East 136th Street and Brook Avenue at the time of the police operation – individuals who had not marched from The Hub and were not protesting – were also arrested.

114.    In the next phase of the NYPD's operation, officers began to systematically handcuff the kettled protesters and subject them to lengthy large-scale arrest processing.

115.    Many protesters, who had done nothing to the officers and were not resisting arrest, were violently thrown to the ground before they were handcuffed.

116.    Officers pulled protesters out of the kettle and used unnecessary force to bring their arms behind them.

117.    Officers systematically applied zip-tie cuffs that were cinched tighter than necessary.

118.    In some instances, officers literally lifted protesters off the ground using the zip-tie cuffs.

119.    Many protesters complained that their zip-tie cuffs were too tight and were causing their hands to become numb, and many protesters' hands turned purple.

120.    Instead of issuing protesters summonses on the street consistent with the requirements of the New York Criminal Procedure Law, the NYPD held protesters over in overly tight zip-tie cuffs and transported them in close quarters to a large-scale arrest processing facility.

121.    Throughout the NYPD's June 4th operation, most of the officers did not wear face masks or face shields to prevent the transmission of the coronavirus.

122.    On June 4, 2020, New York City had suffered more than 280,000 reported cases of COVID-19, and over 1,000 new cases were reported that day.

123.    Unlike the police, most of the protesters did wear masks or face shields, but in many instances, officers forcibly removed protesters' masks and face shields, further endangering their safety.

124.    Once arrested, people were unable to reposition their masks to cover their noses and mouths while they were rear-cuffed, and as a result, they were transported to the arrest processing facilities in enclosed vehicles without proper face coverings. Protesters complained that their faces were left uncovered, but nothing was done to assist them.

125.    The protesters spent from 6 to 20 hours in custody; some were held longer.

126.    Because NYPD did not properly plan for the arrests, most protesters were forced to wait for processing outside, in the rain, for hours — all without any medical attention, willingness to address overtight zip-tie cuffs, or any other basic accommodations.

127.    During that time, Defendant Monahan went to the NYPD arrest-processing facility in Queens.

128.    Protesters detained at the Queens facility asked Defendant Monahan to wear a mask, but he refused to do so.

129.    Upon information and belief, at the Queens facility, Defendant Monahan instructed officers to stop issuing summonses and instead, to issue all remaining protesters Desk Appearance Tickets, thus prolonging their detention.

130.    In September 2020, the Bronx District Attorney's Office filed a motion to dismiss charges against 312 people arrested at the Mott Haven protest on June 4, 2020 in the interests of justice.

C.  **Allegations Specific to Individual Plaintiff.**

i.    ***Shellyne Rodriguez.***

131.    Shellyne Rodriguez is a 44-year-old artist with a Master's Degree, who teaches at Hunter College and the School of Visual Arts.

132.    On June 4, 2020, Ms. Rodriguez participated in the FTP4 Protest.

133.    At around 7:45 pm, Ms. Rodriguez was walking on 136th Street and Brook Avenue, outside (to the east of) of the Mott Haven Kettle and within a few feet to the east of the Brook Avenue Line.

134.    Defendants NYPD Members Detective Donald Sehl, Detective Nin and John or Jane Does 84-85, who had their badge numbers covered, told Ms. Rodriguez in sum and

substance "to get the fuck out of here," to which Ms. Rodriguez replied that she was attempting

to do so.

135.    Defendants Detective Donald Sehl , Detective Nin and John or Jane Does 84-85

then rushed and attacked Ms. Rodriguez.

136.    Defendants Detective Donald Sehl and Does 84 and 85 shoved Ms. Rodriguez's

face into a gate, injuring her lip.

137.    Defendants Detective Donald Sehl and Does 84 and 85 then pulled Ms.

Rodriguez's hair, squeezed the back of her neck, flipped her around such that her back was

against the gate, and then repeatedly punched Ms. Rodriguez in the stomach.

138.    Defendants Does 84 and 85 held Ms. Rodriguez's neck and forced her to bend

over.

139.    As they did so, Defendant Nin grabbed Ms. Rodriguez and applied zip ties to Ms.

Rodriguez's wrists in an extremely tight manner.

140.    Defendant Nin tightened Ms. Rodriguez's zip ties twice.

141.    Ms. Rodriguez immediately told Defendant Nin that her zip ties were too tight.

142.    Defendant Nin ignored Ms. Rodriguez and brought her into a prisoner transport

van.

143.    When Ms. Rodriguez was about to sit down, Defendant Nin yanked on Claimant's

zip ties hard and tightened them even further, causing Ms. Rodriguez to scream out in pain and

yell at Nin that he needed to loosen them.

144.    Defendant Nin again ignored Ms. Rodriguez.

145.    Ms. Rodriguez's mask was removed by NYPD members.

146.    Ms. Rodriguez was the second person loaded into the van.

147.     Defendant Nin brought around a dozen other arrestees to the van one-by-one as Ms. Rodriguez waited in agonizing pain.

148.     Ms. Rodriguez complained to Defendant Nin each time he appeared at the van with a new arrestee that he needed to remove her zip ties, but he ignored her each time.

149.     Defendants Sehl and Nin were in the van, filled with roughly 14 protesters, as it drove first to the 40th and then to the 48th Precinct.

150.     Ms. Rodriguez was forced to be in close proximity to NYPD members and arrestees without her face mask, including people who NYPD members had pepper sprayed, in the extremely hot van, which caused Ms. Rodriguez to suffer an asthma attack.

151.     Ms. Rodriguez and other arrestees repeatedly demanded that Sehl and Nin remove Ms. Rodriguez's cuffs, including by noting that Ms. Rodriguez's hands were beginning to turn blue.

152.     Ms. Rodriguez felt pain with every jerk of the van during the lengthy ride.

153.     By the time Ms. Rodriguez arrived at 48th Precinct and was lined up outside with the other arrestees, she was physically shaking and doubled over in pain.

154.     The pain caused Ms. Rodriguez to slump over.

155.     NYPD Members kept telling Ms. Rodriguez to stand up straight.

156.     Other arrestees yelled to the officers, including Defendants Sehl and Nin, to cut off Ms. Rodriguez's zip ties right away.

157.     Defendant Nin again refused.

158.      When some other NYPD Members said they would cut the cuffs off when Ms. Rodriguez got inside the Precinct, Defendant Nin said in substance: "No! The cuffs will be cut off in the order that people are let in."

159.    When Ms. Rodriguez entered the 48th Precinct, as she was lined up outside cells with other arrestees, other arrestees were screaming for Sehl, Nin, and/or other officers present to cut off Ms. Rodriguez's zip ties right away.

160.    Instead of cutting off Ms. Rodriguez's cuffs, Defendant Nin turned Ms. Rodriguez over to other NYPD members, including Sehl.

161.    At some time at or after around 10:00 p.m. – after Claimant had been cuffed for around or over two hours – Defendants Sehl and  Defendant Noelle Cunningham attempted to remove Ms. Rodriguez's zip ties from her wrists.

162.    The cuffs were so tight, and Ms. Rodriguez's wrists were already so injured, that the police could not get the pliers under the plastic.

163.    The police had to try 3 different sets of pliers, including one that Defendant Nin provided, before successfully removing the cuffs.

164.    After the cuffs came off, Ms. Rodriguez collapsed to the ground in pain.

165.    The process of removing Ms. Rodriguez's cuffs took almost 15 minutes.

166.    Neither Defendant Detective Donald Sehl nor Detective Noelle Cunningham was wearing a mask while trying to uncuff Ms. Rodriguez.

167.    The Rodriguez Defendants caused Ms. Rodriguez extreme pain, including, but not limited to, causing her hands to turn blue as well as numbness, swelling, and other short-and long-term impacts including bilateral thumb numbness due to nerve damage.

168.    Defendant NYPD Officer First Name Unknown ("FNU") Dorch, Tax Registration No. 938388, Command 730, eventually swore out a summons against Ms. Rodriguez, charging her with violating the mayoral curfew executive order.

169.    Ms. Rodriguez was then held in a cell for a few more hours before being released with that summons.

170.    When Ms. Rodriguez asked Defendant Nin for his badge number upon exiting the precinct, he yelled in sum and substance "Get the fuck out of here before I arrest you again! Do you want to go back to jail? I will arrest you right now!"

171.    At approximately 12:00 a.m. on June 5, 2020, Ms. Rodriguez was finally released from custody.

172.    On September 4, 2020, the charges against Ms. Rodriguez were dismissed, on grounds consistent with her innocence.

173.    The injuries to Ms. Rodriguez's wrists continue to cause her pain, and to interfere with her ability to make art.

**D.  <u>The NYPD'S History of Mishandling Protests</u>**

174.    The extensive deprivations of constitutional rights suffered by protestors including the Plaintiffs, during the Summer 2020 Protests are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia,* protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

175.    The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with

demoralizing and brutal shows of force, rather than genuine efforts to facilitate protestors'
protested First Amendment activity.

176.    For example, the NYPD met protests following the start of the Iraq War in 2003
with mass arrests, excessive force, use of pepper spray, riding horses into crowds and baton
strikes to disperse protestors, and kettling to move protestors from specific locations to effectuate
mass arrests. [20]

177.    The next year, during the police "Operation Overload II" operation in response to
the Republican National Convention in 2004, NYPD members treated protestors to similar uses
of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention. [21]

178.    The NYPD continued to employ similar mass arrest and excessive force tactics
during a years-long crackdown on Critical Mass bicycle rides beginning in 2004. [22]

179.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD
used excessive force against protestors, bystanders, and National Lawyers Guild- New York City
Chapter Legal Observers, as well as kettling tactics to move protestors or initiate mass arrests.[23]

180.    Additionally, Defendants have employed the same tactics and practices against
Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

181.    Following NYPD conduct during these and other protests, the City of New York
and the NYPD and its members have been sued repeatedly by protestors who alleged that they
had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and

---

[20] See, e.g., N.Y. Civil Liberties Union, Arresting Protest (2003), available at
https://www.nyclu.org/default/files/nyclu_arresting_protest.pdf.
[21] See, e.g., N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), available at
https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[22] See, e.g., *Callaghan v. City of New York*, 07 Civ. 9611 (PKC) (JLC) (S.D.N.Y.).
[23] See *People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as have the Plaintiffs in this case.

182.    In many these cases defendants employed tactics developed and modified over the course of many years by defendants Shea, Monahan, and their predecessors and by other Defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

a)  *Mandal v. City of New York*., 02-cv-1234 (WHP) (FM) (S.D.N.Y) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g. "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at \*4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgement on plaintiff's Fourteenth Amendment Equal Protection and First Amendment- based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"; *Mandal v. City of New York ("Mandal II")*, No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at \*2 (S.D.N.Y. Nov. 13, 2007) ("Mandal II") (noting that approximately 38 Mandal plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b)  *Barley v. City of New York,* 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia,* (1) NYPD policy of detaining perceived protestors who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c)  *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia,* that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including defendant Monahan, arrested

them and "the police deliberately held [protestors] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d) *Haus v. City of New York*, 03-cv-4915 (RWS) (MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to arrestees to delayed to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al., 04-cv-0665 (RWS) (S.D.N.Y.);*

e) *Kunstler v. City of New York,* 04-cv-1145 (RWS) (MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising Monell and other claims similar and related to the policies and practices complained of herein such as encircling protestors, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest.

f) *MacNamara v. City of New York,* 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), Abdell v. City of New York, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), Schiller v. City New York, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), Kyne v. Wolfowitz, 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, policies related to, the RNC in New York City in 2004, See, e.g., Schiller, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan 23, 2008) (nothing the City's consent to amendment of complaints in RNC cases to add, inter alia, "constitutional challenges to the defendants' alleged practice of detaining…all persons in connection with the RNC…no matter how minor the infraction, rather than issuing summonses on the street"); McNamara v. City of New York, 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan handcuffed with plastic flex cuffs[.]"); Dinler, No. 04-cv-7921 (RJS)(JCF), 2021 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgement on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g) *Callaghan v. City of New York,* 07-cv-9611 (PKC)(JLC) (S.D.N.Y) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading Monell claims virtually identical to the core Monell claims pleased herein));

h) *Osterhoudt v. City of New York,* et. al., No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended

Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendant's motion to dismiss Monell claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i) Despite (then-Mayor Michael Bloomberg's recognition that "the majority of the [OWS] protestors have been peaceful and responsible," [24] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related policies, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgements and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco*, 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j) In *Peat v. City of New York*, No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $ 598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[25] encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or path of egress as members of the scooter task force blocked the protestors path of egress;

k) Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial; *Packard v. City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT);

l) The Plaintiffs in *Case, et al. v. City of New York, et al,* 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including Monell claims with much in common with many

---

[24] Michael Bloomberg, Michael Bloomberg's Statement on the Zuccotti Park Clearance, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zucotti-park.

[25] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protestor activity and engaging in a manner to obstruct protestor's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protestors they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." http://www.nyclu.org/en/nyc-free-speech-threat-assessment.

of those raised herein. *See Case v. City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F. Supp. 3d 313 (SDNY 2019);

m) The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protestors and overall efforts of the NYPD to deter and demoralize protestors. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v. NYC*, 13-cv-(RWS); *Crisp v. NYC*, 12-cv-5482 (RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992 (RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n) Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case Peat*, the Union Square Litigations, as well as several other OWS-related cases, included failure to train Monell claims concerning protest activity that are similar to the Monell claims in this litigation;

o) The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled Arresting Protest, published April 2003, available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_portest.pdf;

p) The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled Rights and Wrongs at the RNC, published in 2005, available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

q) The incidents discussed in the research compiled by the Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street, published July 25, 2015, available at http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r) *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including Monell allegations challenging many of the same policies and practices herein, see, e.g., First Amendment Complaint at Paragraph 415).

## E. NYPD's Permissive Response to Pro-Police and Other, Similar Demonstrations

183.    The NYPD's violent response to protests against police brutality was dramatically different from their response to other kinds of protests and rallies.

184.    On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[26]

185.    On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[27]

186.    In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with

---

[26] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

[27] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.

rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[28]

187.    On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[29]

188.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[30]

189.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the health regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[31][32]

---

[28] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown

**[29]** AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

[30] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[31] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[32] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

190.    The NYPD has a history of treating even right-wing extremists more

permissively. This pattern can be observed from the 1990s to the present.

    a.    In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

    b.    In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[33],[34]

    c.    More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence, but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[35] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[36]

## F.  The NYPD'S Failure to Train Regarding Protest Policing

191.    Since at least the 1990s, the NYPD had failed to appropriately train its officers on

the proper handling of First Amendment assemblies, despite being on notice of serious

constitutional deficiencies in their existing training.

---

[33] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[34] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

[35] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video

[36] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

192.     In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

193.     In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

194.     Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

195.     The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, including by staging overwhelming presence and force at protest activity, as well as making early and "proactive" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

196.     Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – (using the training's terminology) "disperse and demoralize" protestors.

197.     These disperse and demoralize tactics and trainings have persisted through the present including on June 4, 2020 in Mott Haven as exemplified by the experiences of Jones, Williams, Roman, and other protestors who attended said protest and those of others in the summer of 2020. [37]

198.     Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

---

[37] See NYPD Responsible Investigation, New York State Officer of the Attorney General, Preliminary Report on Investigation into NYPD interaction with protestors, archive of written testimony incorporated herein by reference.

199.    However, neither the Disorder Control Guidelines, nor upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

200.    On information and belief, there was, and is, virtually no NYPD training – and certainly no meaningful NYPD training – focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protestors, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, use of force to make arrests, issuance of summons, issue of flex cuffs, mass arrests, and the like.

201.    Defendants' failures to train, supervise and/or retrain led to violations of Plaintiffs' rights in this case, include, *inter alia,* the following:

a)    The failure to provide constitutionally meaningful dispersal disorders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply and the like;

b)    The failure to make clear the need for individualized probable cause to arrest in a protest context;

c)    The failure to provide training on the needs for fair warning and a meaningful opportunity to comply with police directions as a prerequisite for probable cause to arrest for a Curfew Order violation;

d)   The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

e)   The failure to provide training with regard to the proper application and removal of flex-cuffs, including how to measure the appropriate tension on flex cuffs; how to assess the need to remove flex-cuffs; how long flex-cuffs may be worn before a significant risk of nerve damage develops; the safest types of removal equipment to use and how to use removal equipment properly so as not to accidentally tighten flex-cuffs further in the process of removal; providing officers with necessary tools to remove or loosen flex-cuffs;

f)   The failure to provide training on the importance and need for NYPD members to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other similar safety measures in light of the COVID-19 pandemic;

g)   The failure to provide training on the duty to intervene, stop, mitigate, and report officers who use excessive force while policing said event;

h)   The failure to provide training in de-escalation techniques;[38]

i)   The failure to provide training in the duty not to use excessive or unnecessary force; and

---

[38] *See* New York City Department of Investigation Office of the Inspector General for the NYPD (OIG-NYPD), "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," October 2015, *available online at* https://www1.nyc.gov/assets/doi/reports/pdf/2015/2015-10-01-Pr_uofrpt.pdf (finding, *inter alia,* that NYPD use of force policy is vague and imprecise, and provides insufficient instruction on de-escalation).

j)   Failures to supervise and discipline NYPD members for misconduct at protests, including false arrests, mass arrests, uses of force, and subjecting arrestees to unduly long, onerous, and unsafe arrest processing.

202.   Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

203.   The SRG, deployed around the City at protests in 2020 including the protest that is the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

204.   The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

205.   In response to the public's skepticism that the SRG would be used to crack down on protests, then- Chief of Department James O'Neill stated: "They will not be involved handling protests and demonstrations. They'll have no role in protests. Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city." [39]

206.   However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

207.   Upon information and belief, SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of

---

[39] Ben Yakas, NYPD: Fine, Maybe We Won't Police Protests With Machine Guns, Gothamist, Jan. 30, 2015, available at https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.

misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits. [40]

208.    SRG members are meant to have additional DCU training.

209.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

210.    However, upon information and belief, many of the officers deployed to respond to the protests in 2020, including Mott Haven, did not even receive that training, which was supposedly required of them.

211.    As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received in the Academy. [41]

212.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgements and settlements.

213.    Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors – including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created

---

[40] Ali Winston, NYPD Unite At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories, The Appeal, Oct. 15, 2020, available at https://theappeal.org/nypd-srg-misconduct/.
[41] OCC Report at 37.

"after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

214.    For example, in an March 17, 2006 New York Times article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-actions reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY). [42]

215.    Those reports praised employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protestors.

216.    After the 2002 WEF after-action reports were disclosed in Allen and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, the NYPD opted to discontinue creating such reports, documented and assessed the NYPD's protest policing-related policies and tactics.

217.    Upon information and belief, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

218.    Nevertheless, upon information and belief, at prior to and during the summer of 2020 protests, Defendants Shea, Monahan, and other Defendant City policymakers would routinely receive reports regarding arrests made in connections with First Amendment

---

[42] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest, "N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17nyregion/police-memos-say-arrest-tactics-calmed-protst.html.

assemblies. Said "internal reports" including but not limited to: Unusual Occurrence Reports;

Mass Arrest Reports including data tracking arrestees, the length of time it took them to go

through the system, whether they were released with a summons or DAT, their proposed arrest

charges, and other information related to the status and/or dispositions of the cases; internal

critiques from supervisors and other officers involved in mass arrests related to police actions

taken in relation to an event; and/or other reports including information arrests, use of force

protest arrest processing, and/or prosecutions.

219.    Despite the wealth of evidence of NYPD members' historical brutality against

protestors, Defendant City has ignored, and/or failed to utilize relevant information, including

information gleaned from complaints, investigations, news coverage reports and lawsuits, as well

as other data points, to identify deficiencies in NYPD training as it related to constitutionally

complaint protest policing, and policing in general such as de-escalation techniques and proper

use of force.

220.    For example, in a deposition in *Packard v. City of New York,* 15-cv-7130

(S.D.N.Y.) (AT), a witness for the City of New York testified that in regard to protest police

training it did not review (i) decline to prosecute decisions, (ii) conviction conversation rates or

(iii) allegations and settlements in lawsuits relating to protests.

221.    As another example, Defendant City apparently does not take allegations in

lawsuits filed by protestors claiming they were falsely arrested during protests into account in

considering its protest policing-related policies and training, in effect taking the position that

there is nothing to be learned from lawsuits and settlements.

222.    For example, in a 2017 deposition, a Fed. R. Civ. P. 30(b) (6) witness designated

to testify on sidewalk policy protesting, dispersal orders, and training on probable cause

standards for crimes commonly charged in protest policing by the Defendant City could identify no impact that litigation against City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training.

223. Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[43]

224. At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests- despite having received clear notice that NYPD policing of protests has caused the systemic violations of protestors' constitutional rights for years – demonstrates both a history and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other related rights of Plaintiffs and other  similarity injured protestors.

**G. The NYPD's Policy and/or Practice of Using Excessive Force to Control the Speech of Protestors**

225. Defendants used types and levels of force that were excessive and unnecessary force against the Plaintiffs and other similarity situated protestors.

226. In many cases, those uses of force were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

227. Upon information and belief in many cases, defendants failed to document, and/or require that fellow defendants and/or fellow officers' document, uses of force in accordance with related NYPD policies and/or training.

---

[43] OCC Reports at 2, 30.

228.    Further, upon information and belief, the defendants used force against plaintiffs based on their position in or proximity to a perceived group, without first having given the perceived group clearly communicated prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

229.    Defendants used types of force, such as deploying pepper spray or mace, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

230.    Additionally, Plaintiffs and others arrested at the protest that are the subjects of this litigation were handcuffed with their wrists together and their hands behind their back with plastic flex-cuffs for hours.

231.    In many cases, Plaintiffs and/or other arrestees complained about the fact that their flex-cuffs were too tight causing them pain and/or causing them injury.

232.    Specifically, because they were arrested at a protest, Plaintiffs were subjected to tight and extensive time being held in flex-cuffs pursuant to defendant's Protest Arrest Processing Policies.

233.    Defendant City did not supply Defendants with enough cutting tools with which to loosen or remove flex-cuffs, or any flex-cuffs pads, which are designed to prevent the very types of injuries Plaintiffs and other arrestees suffered as a result of having flex-cuffs applied to them.

234.    It was no secret to Defendants that using flex-cuffs to restrain protestors- including without providing adequate numbers of cutting tools or any protective padding –

would result in injuries to protestors, of the sort that appropriate policies, training, and/or supervision would have been avoided.

235.   For example, *Burley v. City of New York*, 03-cv-2915 (WHP) (FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) was a class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia,* the NYPD's then-policy and practice of using plastic flex cuffs as "unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed."

236.   Plaintiffs in *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, also raised Monell claims around NYPD members' use of extremely tight, plastic handcuffs.

237.   Additionally, in *McNamara v. City of New York*, 04-cv-9216 (RJS) (JCF) (S.D.N.Y.), the Court certified a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs." See McNamara v. City of New York, 275 F.R.D 125, 154 (S.D.N.Y. 2011)

238.   Those cases, and many others, challenged the City's and NYPD's policies and practices regarding the use of flex-cuffs to restrain protestors, and put the defendants in this case on notice of the potential for injury and harm suffered when the flex cuffs are applied improperly, and for too long a period of time.

239.   Relatedly, the DOI Report found, "When voicing those concerns to their arresting officers or other officers in the area, arrestees were told that the officers lacked the necessary

equipment to remove the flex-cuffs. Arrestees therefore had to wait, oftentimes for long periods, until they got to their respective arrest processing center so that flex-cuffs could be removed." [44]

### H. Defendants' Policies And Practices Regarding Arrests — Including Mass Arrests — Without Fair Warning Or An Opportunity To Comply.

240.    As set forth in this complaint the NYPD used a tactic known as kettling to surround, trap and prevent movement by the protestors from leaving the "kettle" area.

241.    Defendants used this tactic at prior protests as well.

242.    Not only did Defendants not allow the protestors to leave the kettled area prior to the 8:00 p.m. curfew, they also failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

243.    As a result, most of the protestors at Mott Haven (and in other protests which preceded it) were arrested in connection with perceived violations of Mayor de Blasio's Curfew Orders, or for perceived violations of New York Penal Law 240.20(6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order), yet Defendants failed to give constitutionally meaningful and adequate dispersal order and meaningful opportunities to disperse prior to making such arrests, and/or ensure that each such arrested Plaintiff had the state of mind required for such arrest.

244.    With respect to de Blasio's Curfew Orders, the plain language of de Blasio's Curfew Orders required both (a) a knowing violation of the Executive Order prior to any arrest

---

[44] See, e.g., DOI Report at 42. See also, AG Report at 29 ("Officers kept the [flex-cuffs] on their wrists even after they were placed in cells, which, for some, cut off their circulation or caused other injuries to their wrists, including cuts and nerve damage.")

and (b) that any arrest could only follow a dispersal order, a meaningful opportunity to disperse, and a person's refusal to comply with the order.

245.     As pled elsewhere herein, Defendants enforced the Curfew Orders by arresting Plaintiffs and other protestors without first ensuring that they had been given dispersal orders, meaningful opportunities to disperse, and that their refusal to comply was either knowing or voluntary. In sum protestors were arrested under circumstances in which Defendants had not ensured that arrestees had knowingly violated the Curfew Orders.

246.     That enforcement was consistent with official NYPD policy, as set out in the allegations regarding the FINEST message issued June 3 above.

247.     That is, NYPD issued a FINEST message that, when read in conjunction with an earlier message stating that protesters must be given an order to disperse before a curfew arrest, authorized and adopted a policy of arresting protesters with no order to disperse or opportunity to comply.

248.     For example, in a September 16, 2020 letter from NYPD Deputy Commissioner of Legal Matters Ernest F. Hart to Ida Sawyer, Acting Crisis and Conflict Director, Human Rights Watch,[45] Deputy Commissioner Hart stated that officers who merely "observed individuals who were not essential workers in public…[t]hat observation provided officers with probable cause to take, at a minimum, enforcement for Administrative Code § 3-108, Violating a Mayoral Executive Order, a 'B' Misdemeanor."

249.     Additionally, in many cases, Defendants enforced other provisions of New York law against Plaintiffs and other perceived protesters without probable cause and/or without first

---

[45] Available at https://www.hrw.org/sites/default/files/media_2020/09/Annex%20II_0.pdf.

having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

250.    For example, with respect to protesters at other protests who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested Plaintiff had caused a criminally significant blockage of traffic, and/or to ensure that each such arrested Plaintiff had the state of mind required for such arrest.

251.    By way of further example, with respect to protesters at other protests who were arrested in connection with perceived violations of New York Vehicle and Traffic Law § 1156(a) (Pedestrians on Roadway), Defendants failed to ensure that each such arrested Plaintiff had notice that they were allegedly violating the law by walking along and/or upon a roadway and/or a meaningful opportunity to conform their conduct to the law in order to avoid being arrested.

252.    Defendants also enforced provisions of New York law similar to those for which Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with – for example, VTL § 1156(a), which involves walking along or upon a roadway when an adjacent and usable sidewalk is available – the equivalent of jaywalking, an everyday offense that Defendants all but ignore in the City.

253.    And throughout the City, during the protests, very few if any non-protest-related arrests were made for curfew violations.

254.    Similarly, and upon information and belief, Defendants made few if any non-protest-related arrests for curfew without providing opportunities to disperse.

255.    Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiffs and other

perceived protesters, including by kettling, without first having given Plaintiffs and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

256.     Defendants thus acted with a policy, custom or pattern of trapping protestors prior to curfew and then enforcing said curfew by arresting those who were trapped and not permitted to leave.

257.     The City was deliberating indifferent to this practice, and despite knowing that it was occurring, took no steps to stop it from continuing.

**I.     Defendants' Protest Arrest Processing Policies and Practices.**

258.     Defendants arrested Plaintiffs for alleged offenses which New York Criminal Procedure Law § 150.20 required them to grant Plaintiffs summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

259.     However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved, among other components, placing Plaintiffs and other arrestees in flex-cuffs and removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where Defendants subject them to large-scale arrest processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

260.     Additionally, as a result, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them,

Defendants subjected Plaintiffs to flex-cuffing as well as unreasonably lengthy, onerous arrest processing, significantly increasing the amount of time they would otherwise have been in custody and exposing them to inappropriate and especially hazardous conditions of confinement, as well as searches of their persons and property, and/or seizures and/or retentions of their property without adequate pre- or post-deprivation notice and/or opportunity to be heard to challenge the grounds for seizing and/or retaining the property.

261.    In some cases, NYPD members destroyed and/or damaged property belonging to Plaintiffs and other arrestees.

262.    In other cases, NYPD members seized and retained property from Plaintiffs and other arrestees without providing them with the NYPD paperwork required by NYPD policies, practices, and procedures to retrieve property seized by NYPD members.

263.    In still other cases, NYPD members seized and retained property without providing Plaintiffs with a meaningful opportunity to retrieve it, for example because the location at which Defendants were retaining the property was closed.

264.    The conditions of confinement were unsafe and overcrowded, particularly in the context of the COVID-19 pandemic, and/or filthy and/or unsanitary; and lacked appropriate access to phone calls, food, water, bathrooms soap and/or hand sanitizer, other hygienic products such as tampons, and/or other basic necessities.

265.    With particular respect to the COVID-19 pandemic, during Plaintiffs' confinements, the State of New York, and Defendant City, had advised people to comply with social distancing, to wear masks, and to engage in practices such as hand-washing; and Defendant City, as well as Defendants Shea, Monahan, and other NYPD members, enforced

Executive Orders issued by Mayor de Blasio requiring people to engage in social distancing and/or mask-wearing, all on an emergency basis.

266.    However, as part of Defendants' Protest Arrest Processing Policies and MAPP, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants transported Plaintiffs to a MAPC or other centralized arrest processing location, in close, forced proximity to other arrestees and NYPD members, many of whom were not wearing masks, rendering social distancing impossible.

267.    Relatedly, many Defendants and other nearby NYPD members were not wearing masks while arresting and/or using force on and/or detaining Plaintiffs.

268.    Also relatedly, Defendants and other NYPD members removed masks. Many Plaintiffs and other arrestees who had masks at one point prior to or during their arrests or detentions.

269.    Also as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiffs and other arrestees to conditions of confinement in which they were unable to wash their hands or otherwise engage in other, similar hygienic practices that the State and City were recommending for public health and safety.

270.    Defendants knew or should have known that, as a result of subjecting Plaintiffs and other arrestees to Defendants' Protest Arrest Processing Policies and MAPP, they would deprive Plaintiffs and other arrestees of basic needs, including for example the need to stay safe from COVID-19, as well as unreasonable risks of serious damage to their physical and/or mental health or safety through potential exposure to COVID-19.

271.     Defendants acted intentionally to impose those conditions because they subjected

Plaintiffs and other arrestees to Defendants' Protest Arrest Processing Policies and MAPP.

272.     Additionally, Defendants recklessly failed to act with reasonable care to mitigate

the risks that the conditions posed even though they knew or should have known that they posed

excessive risks to Plaintiffs' physical and/or mental health or safety through potential exposure

to COVID-19.

273.     Moreover, the risks were obvious and apparent, including based on the State and

City policies and practices related to COVID-19 safety, and common sense.

### J. Defendants' Failure to Track NYPD Members During Protests

274.     Defendant CITY OF NEW YORK instituted and maintained a practice and policy

by NYPD whereby it fails to track the whereabouts of its officers participating in arrests and uses

of force in protests, by:

> A.  Failing to complete or make eligible detail rosters or other paperwork to track
> which officers are assigned to which precinct, vehicle, or equipment;
>
> B. Failing to complete crucial reports, such as TRI (Threat, Resistance, Injury) reports
> that document use of force and injuries to civilians and officers.

275.     There were numerous NYPD documentation and officer deployment tracking

failures during the protests. By failing to adequately track officers during the protests,

Defendants made it more difficult to determine the identities of officers who engage in

misconduct, thus making it more difficult to hold these officers accountable for their actions.

276.     In the Civilian Complaint Review Board (CCRB) report on NYC 2020 protests,

CCRB cited "the NYPD's failure to track and document where officers, vehicles, and equipment

were deployed" as a chief challenge that CCRB faced when investigating protest-related

complaints, leading to complaints being closed as "Officer Unidentified" because the CCRB

could not determine which officers were involved in the alleged misconduct.[46]

277.    NYPD detail rosters, which track which officers are assigned to which precinct,

were often incomplete or filled with illegible handwriting. Threat, Injury, and Resistance (TRI)

reports that document the use of force and injuries to civilians and officers were often not

completed at all. Additionally, during interviews with the Civilian Complaint Review Board,

officers of various ranks stated that they could not identify the commanding officers who gave

them directives, nor could they identify the fellow officers who had been deployed with them to

protests.[47]

278.    Several representative cases show how officers accused of misconduct during

protests could not be identified due to individual officer and departmental documentation

failures. For example, in CCRB Case No. 202003765, on May 31, 2020, a witness observed a

marked police van driving dangerously close to protestors. The search for body-worn camera

footage from the van's assigned precinct yielded negative results. NYPD said they did not

maintain a log of which officers took the van, so the complaint closed as Officer Unidentified.[48]

279.    In CCRB Case No. 202004179, on May 29, 2020, during a BLM protest in the

88th Precinct in Brooklyn, unidentified officers pushed civilians to the ground, shoved batons

into their backs, and pinned them against fences using riot shields. The NYPD submitted the

detail roster for the precinct, but most of its 59 pages were illegible. As a result, the CCRB could

not identify which officers were deployed and involved in the alleged use of force against the

protestors.[49]

---

[46] CCRB Report on 2020 Protests, p. 12.
[47] See, CCRB Report at 13.
[48] CCRB Report on 2020 Protests, p. 13-14.
[49] Ibid, p. 14-15.

280.    In CCRB Cases No. 202004204 and 202004071, on June 4th, 2020, during a March Against Police Brutality in Brooklyn, unidentified police officers pushed a civilian to the ground, punched on his upper body and head, and crushed his eyeglasses with his foot. NYPD's paperwork showed that at least 175 officers were assigned to handle protest-related activity, but none of the rosters identified specific deployment locations. The CCRB was thus unable to identify the officers engaged in the alleged misconduct. [50]

281.    Here, Defendants Sehl, Cunningham and Nin were only able to be identified because of third party, non-City of New York, photographs and even then original attempts by top NYPD leadership were unsuccessful in identifying the officers, despite clear photos of NYPD helmets with numbers.  Does 84-85 remain unidentified. Had the NYPD tracked the location of officers, the Does in this matter may have been able to be identified and Sehl, Cunningham, and Nin would have been able to be identified without substantial litigation.

### K. Defendants' Policies and Practices of Concealing Officer Identities, including through covering badge numbers, wearing helmets with shield numbers belonging to other officers and failing to turn over body worn camera footage

282.    Plaintiff has engaged in herculean efforts to identify the Doe officers in this case over the past three years — and, indeed, the NYPD itself has also used "best efforts" to do so. ECF No. 53-1.

283.    Plaintiffs efforts include, but are not limited to:

  a.   Filing a Notice of Claim on September 2, 2020;

  b.   Sitting for a 50-h hearing on February 17, 2021;

---

[50] Ibid., p. 15.

    c.   Engaging in informal conversations with those present at the FTP4 protest and taking pictures, trying to get those documents;

    d.   Filing this case;

    e.   Coordinating this case with discovery in *In re New York City Policing During Summer 2020 Demonstrations*, 20-cv-8924 (*see* ECF No. 14), and having her counsel review footage and documents from that case;

    f.   Serving discovery on Defendants;

    g.   Serving a subpoena on a professional photographer that took photos of Plaintiff's arrest (*see, e.g.,* ECF Nos. 28 (detailing the extended efforts to serve the subpoena, and asking for leave to serve by alternative means) and 29), and obtaining many gigabytes of relevant photographs that, unfortunately, still had Defendants' identity information obstructed (as detailed below);

    h.   Moving to have the Court Order Defendants to identify the Doe Officers (ECF Nos. 49 and 51), which the Court did in ECF No. 52;

    i.   In turn, that order compelled NYPD to use its "best efforts" (ECF No. 53-1) and apparently fail; and

    j.   Pressing further and ultimately getting Defendants to identify two of the core, relevant Does, but not Does 84 and 85;

284.    That is, despite that laundry list, Plaintiff has been unable to identify Does 84 and 85, and the statute of limitations will pass shortly after this amended complaint is filed.

285.    That result is exactly the design of the City's unwritten policy.

286.    Defendant CITY OF NEW YORK has instituted and maintained a practice and policy by NYPD whereby it permitted its officer employees to conceal their own identities and the identities of fellow officers participating in protest arrests and uses of force in protests by:

> A.  covering up their badges with bands or other materials so their identification information would be not visible when they make arrest and use force against protestors;
>
> B.   swapping or tampering with their helmets so that their shield numbers would be not visible or not correctly corresponding to the identities of the actual persons wearing the helmets when they make arrest and use force against protestors;
>
> C.   failing to provide meaningful responses to requests for footage from officers' body-worn cameras and other NYPD-controlled cameras that resulted in delayed responses, false positives, false negatives, and inconsistent responses;
>
> D.  ordering arrests, making arrests, and using force during arrests, without filing reports or leaving any public record of their own identity, or the identities of fellow officers participating directly in such arrests and uses of force.

287.    This practice and policy of concealing officer identities has been longstanding, and is forth in multiple other civil rights actions filed against Defendant CITY OF NEW YORK, including, but not limited to, *Garcia v. Bloomberg*, 11 CIV 6957, filed in the Southern District of New York on Oct. 4, 2011, *Peat v. City of New York*, 12-cv-8230, filed in the Southern District of New York on Nov. 13, 2012, *Gonzalez v. City of N.Y.*, filed in the Southern District of New York on Sep. 29, 2014, and *Pesola v. City of New York,* No. 15-cv-1917, filed in the Southern District of New York on Mar. 13, 2015.  The content and allegations in the operative pleading in those cases is incorporated herein by reference.

288.    Throughout protest cases in the twenty-first century, the City of New York has litigated this issue over, and over, and over again — each time running into the same issues, knowing that its policies always result in the same situation:  protester-plaintiffs being unable to vindicate their rights ***not*** because of deficiencies in their claims, but because officers are

unknown.  At best, that means those plaintiffs still prevail on *Monell* claims (and *respondeat superior* state law claims without attorneys' fees), at worst those plaintiffs are stopped from pursuing their claims at all.

289.    Although defendants City, Shea, Monahan, Lehr and other policymakers actually knew, or should have known, that NYPD members were obscuring their identities by covering their badges during the protests, they failed to stop members from doing so — and indeed, tacitly endorsed that practice.

290.    According to NY State Senate Bill S8849, the NY Right to Vote Act, and the NYPD's own policy, members of the NYPD are prohibited from intentionally covering their badges.

291.    The Defendant City was specifically on this notice as relates to the planned enforcement action in this case, and yet tacitly encouraged officers to hide their identities in this specific enforcement action.

292.    In the first days of the BLM protests, it became very publicly clear that officers were hiding their identities by covering their badge numbers, among other things.

293.    For example, on June 3, 2020, the Intercept published an article detailing this. *See* Nick Pinto, *NYPD Officers at George Floyd Protests are Covering Their Badge Numbers in Violation Of Own Policy*, Intercept (Jun. 3, 2020).

294.    Likewise, at 2:24 am on June 4, 2020 (e.g., on the evening of June 3), Business Insider published a similar articular.  *See* Alex Nicoll, *Some police have appeared to cover their badges with black bands at protests. Police say it is to mourn fallen officers, advocates say it is to hide misconduct,* Business Insider (Jun. 4, 2020).

295.    Numerous other articles cover the same issue.

296.    In the wake of this becoming publicly clear, on June 2, 2020, the National Lawyers Guild sent a letter to both the City's then-Corporation (James Johnson) and Defendant Shea detailing the problem.  That letter is available online, and is referred to below as the June 2 NLG Letter.

297.    As set out in the June 2 NLG Letter, throughout the early BLM protests in 2020, "many members of the NYPD have purposefully occluded their shield numbers with black tape or other opaque material, thus rendering it impossible to discern the members' shield numbers" and that "has even been done in the immediate vicinity of white-shirted supervisory personnel."

298.    As set out in the June 2 NLG Letter, throughout the early BLM protests in 2020,

299.    In the Civilian Complaint Review Board (CCRB) report on NYC 2020 protests, "This action – in addition to being violative of Patrol Guide § 204-17 - serves to prevent aggrieved individuals from being able to identify the perpetrators of police misconduct or relevant witnesses to same, and the failure of the NYPD to stop this practice provides a sense of impunity to members of the service that they can violate demonstrators' rights without consequence."

300.    The June 2 NLG Letter also linked multiple videos showing white shirted supervisors within long lines of police officers with a majority covering their badge numbers, all doing nothing to prevent those actions.

301.    As set out in the June 2 NLG letter, the NLG issued a "demand that the NYPD take immediate steps to reiterate that every member of the service in uniform must at all times leave their shield numbers (and all other identifying information) plainly visible to members of the public at all times. We further ask that we be informed of how this has been and will be

accomplished (by means of interim order, disciplinary action taken against violators, and / or otherwise) by the end of the day tomorrow."

302.    The NLG further cautioned, "In addition to preventing access to the courts to those aggrieved by police misconduct (by preventing proper defendants from being identified), the failure to stop this activity also may subject the City to liability under M*onell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978)."

303.    The NLG also asked for a response, stating if nothing was done, "we stand ready to seek a temporary restraining order to require that this activity be immediately stopped so that demonstrators in this City may exercise their First Amendment rights safely and without fear."

304.    The Corporation Counsel responded to the June 2 NLG Letter personally.

305.    In a June 3, 2020 response, he wrote:  "I have forwarded your letter to Commissioner of Investigation Margaret Garnett, who will be leading the fact-finding portion of the City's review of NYPD actions during the protests.   The City is currently reviewing the other issues raised in your letter."

306.    That is, the City was specifically on notice of this problem on June 3.

307.    Similar to the NLG, the Legal Aid Society sent a letter on June 3, 2020, also highlighting the systemic hiding of identities (the "June 3 LAS Letter").

308.    The June 3 LAS Letter explained that "[d]uring the[ 2020 BLM] protests, participants and observers noted that many NYPD officers have obscured their shield numbers with black tape or other opaque material, preventing the public from viewing officers' shield numbers" and that "officers have refused to respond to requests for identifying information, such as the officer's name and shield number and the reason for their stop or arrest," citing many specific examples.

309.     The June 3 LAS Letter also explained that "officers appear to be violating the RTKA, by refusing to provide their name and shield numbers or a business card containing such information either upon request or as mandated after certain encounters. N.Y.C. Admin. Code § 14-174(b)-(c). The primary purpose of the identification requirements under the RTKA [the Right to Know Act] is to prevent police abuse and promote more transparency in police interaction with the public. These accountability mechanisms are necessary to ensure that NYPD officers do not act with impunity and to allow victims of police misconduct to identify officers engaged in, or witnesses to, the misconduct. These objectives are especially important during protests and demonstrations."

310.     The June 3 LAS letter likewise closes by asking, "In light of the explicit violation of Patrol Guide 204-17 and the RTKA, we request that the NYPD immediately instruct all officers to remove any covering that obstructs public view of any officer's badge. Due to the protests underway, we ask that the NYPD prioritize those commands that will respond to protests. We further request that, by close of business tomorrow, you confirm the NYPD's compliance with Patrol Guide 204-17 and the RTKA with detailed information about what steps were taken to ensure that compliance."

311.     The NYPD, through Deputy Commissioner Hart, acknowledged receipt of the June 3 LAS letter on June 5, 2020, in a similar letter to that sent by the City's Corporation Counsel.

312.     The NYPD, again through Deputy Commissioner Hart, likewise sent a response to the June 2 NLG letter on June 5, 2020.

313.    Countless citizens also informed the City and its personnel of this problem across social media in the days between May 28, 2020 and June 4, 2020.  Hundreds of posts documented members of the NYPD using anything and everything to hide their identities, including tape, bands, and even masks, as well as documenting the practice of wearing the *wrong* helmet to avoid identification, as well as some individual officers saying they were "ordered" to cover their badge numbers and remove name tags.











314.    In short, as of the FTP4 protest, the City was unambiguously on notice that its

officers would be hiding their identities if it did take some action.

315.    Likewise, it was very public and well known as the City began the FTP4

enforcement action that, *unless the City took action*, officers would be covering their badge

numbers and otherwise hiding their identities.

316.    Despite the above notice, the City did not take any action at all to attempt to stop

officers from hiding their identities.

61

317. Instead, upon information and belief, the City either said nothing at all, or in fact let supervisors continue to encourage officers to cover their badge numbers and use helmets with the wrong numbers.

318. This is perhaps because, for the City, this was not a bug, it was a feature: because *Monell* claims against the City are much harder to prove, people can typically only sue for officer misconduct if they can identify individual officers.

319. And the City almost always, if not literally always (which is, upon information and belief, the case), indemnifies officers engaged in misconduct at protests against punitive and actual damage awards (as well as fee awards).

320. Upon information and belief, at the very least, in the last two decades, the City has never declined to indemnify an officer from a damage award or a punitive damage award.

321. Thus, it's the City's own money that gets protected when individual citizens cannot bring lawsuits against individual officers.

322. Thus, the City has made a policy decision to — while it says *on paper* that officers should not hide their badge numbers — allow and even encourage officers to do just that.

323. Indeed, as set out above — and upon information and belief — some supervisors including possibly then-Commissioner Shea encouraged officers to cover their badge numbers specifically during the 2020 BLM protests and the FTP4 protest on June 4.

324. In the wake of the 2020 BLM protests, the effects of this policy were clear.

325. For example, in explaining why so few investigations could be substantiated, the CCRB cited "the actions NYPD members took to conceal their identities, which prevented them from being identified by complainants, victims, and witnesses" as a chief challenge that CCRB

faced when investigating protest-related complaints, leading to complaints being closed as "Officer Unidentified" because the CCRB could not determine which officers were involved in the alleged misconduct.[51]

326.    Of the 226 fully investigated complaints, 59 were closed as "Officer Unidentified." The Board was unable to identify the officers involved in a staggering 43% (609) of fully investigated allegations of protest-related misconduct. That is almost four times the percentage of subject officers who could not be identified in non-protest complaints (11%).[52]

327.    The CCRB found that purposeful actions by officers, such as obscuring badges and refusing to identify themselves to civilians, resulted in multiple members being unidentified. A representative example is CCRB Case No. 202003985, where on June 6th, 2020, in Brooklyn, a civilian attending vigil for Breonna Taylor reported seeing a uniformed officer with a mourning band over her shield. Officer refused to identify her shield number when asked.[53]

328.    The concealment of badges is so frequent that "obscuring shield" was given a dedicated misconduct allegation category when the Agency categorized the Abuse of Authority protest allegations.[54]

329.    There have been numerous reports including photographic and video evidence depicting NYPD members covering their badges during the protests. For example, the NLG's letter to the NYPD threatening litigation over NYPD members covering badge numbers includes two viral clips of police officers covering their badge numbers with black mourning tape.[55]

---

[51] CCRB Report on 2020 Protests, p. 12.
[52] Ibid.
[53] Ibid, p. 13.
[54] Ibid.
[55] June 2 NLG Letter.

330.     Additionally, there has been numerous eyewitness testimony from members of the public observing NYPD members purposefully covering their badges with black mourning bands. When worn properly, these bands do not cover an officer's identifying information, which is located on the bottom of an officer's badge.

331.     With regard to NYPD's response to demonstrations following the death of George Floyd, AG James held a three-day public hearing with participation from NYPD Commissioner Dermot Shea on July 17, 18, and 22. During these public hearings, dozens of witnesses testify that NYPD officers covered their identifications during protests, and explained that – apparently contrary to the written policy — they understood they were allowed to cover their badge numbers with black mourning bands to commemorate officers lost to Covid.

332.     Despite the wealth of evidence showing NYPD members obscuring their identities by covering their badge numbers, upon information and belief, there has been virtually no explicit and active action by NYPD leadership to stop members from doing so.

333.     Instead of taking action to stop members from covering their badges, NYPD officials sought to downplay or deny that NYPD members are obscuring badge numbers altogether.

334.     For example, NYPD officials interviewed by the DOI stated that they did not witness a single instance of NYPD members intentionally covering the badge numbers with their mourning bands.[56]

335.     That obvious lie — at a minimum, any person with a pulse would have seen at least a single instance — demonstrates consciousness of wrongdoing.

---

[56] DOI Report at 46.

336.    NYPD not only condones its officers to conceal their identities when making arrests and use of force during protests, but aids their concealment of identities by its failure to track the whereabouts of its officers and equipment and failure to respond to requests for footage from officers' body-worn cameras.

337.    For example, in CCRB Case No. 20200594, on June 4th, 2020, in Mott Haven, a civilian witnessed police officers assaulting protestors and threatening healthcare workers. CCRB investigators reviewed body-worn camera footage, which showed officers wearing shields or helmets with numbers on them. When the investigators interviewed the officers to whom the numbers were assigned, they found that the officers in the video are not the ones these numbers are assigned to. As a result of the officers wearing inaccurate shields and helmets as well as NYPD's lack of documentation as to which officers were assigned the riot gear, the CCRB was unable to identify the officers engaged in the misconduct and closed the complaint as "Officer Unidentified."[57]

338.    Here, Defendants Nin, Sehl, Cunningham and Does 84-5 all had their badges covered, delaying or preventing their identification.

339.    Defendants Sehl and Cunnignham wore NYPD helmets with shield numbers that did not belong to them. The NYPD did not keep any records connecting the helmet shield number with the officers who wore the helmets, including these two NYPD members. Because of this, initial attempts to identify Sehl and Cunningham pointed to other officers or led to no results.[58]

340.    Without the photographs in this case, and because of the NYPD's policy and practice of allowing officers to cover their badge numbers and wear helmets belonging to other

---

[57] CCRB Report on 2020 Protests, p. 14.

officers, Defendants Sehl, Cunningham and Nin would not be able to be identified, and Does 84-85 remain unidentified.

341.    In fact before Defendants Sehl and Cunningham were identified, in response to Plaintiff's exhaustive efforts and motions regarding Doe identification, Director Laura M. Mulle filed a declaration in this case noting:

      a.    "the NYPD and the Law Department have made best efforts and have been unable to identify Does 82 and 86";

      b.    "The NYPD has searched for any Body-Worn Camera footage captured by Detective Nin on June 4, 2020, and has found no such footage."[59]

      c.    That while helmet numbers "should correspond with officers' shield number[,] upon a search of electronic records maintained by the NYPD, the numbers on the helmets of the officers in the photographs do not correspond to the shield number of any active Member of Service who was on duty on June 4, 2020."

ECF No. 53-1.

342.    That is, despite the "best efforts" of one of the world's largest security and paramilitary organizations, the concealment efforts and actions of officers thwart basic tracking.

343.    The NYPD used its best efforts to try to identify the remaining Does.

344.    And yet, it was unable to do so.

---

[59] Defendant Nin, and the other Doe Defendants, were required by NYPD policy to activate their body cameras as detailed elsewhere — meaning that Director Mulle is describing an affirmative violation of City policy by Defendants Nin, as well as Sehl and Cunningham (the two who were later identified).  Yet, upon information and belief, despite having caused a situation that roped in a Director within the legal department and required the NYPD to publicly admit it could not figure out where and what its members were doing, none of these Defendants have faced any discipline for this obvious rule-breaking.

345.    And the actions of those Does — specifically, use of the wrong helmets, covering of their badge numbers and removal of name plates, failure to activate body cameras, and so on — prevented those best efforts from being successful.

346.    But despite that, the NYPD has taken no steps to discipline anyone, not even those officers who initially prevented Director Mulle and her team from identifying them but were ultimately discovered (e.g., Defendants Sehl and Cunningham).

347.    The consequences for Plaintiff are clear:  She cannot pursue her claims against the Doe Defendants 84 and 85, including those claims for punitive damages.

348.    Likewise, she has been deprived of the effect of their testimony and the ability to find out whether those officers have a pattern of similar conduct that might impact her case otherwise.

349.    For example, if Defendant Doe 85 has repeatedly engaged in similar conduct at past protests, a jury would be much more likely to (1) believe Plaintiff's testimony and story *as against the City and other defendants* and (2) would be more likely to award a larger punitive damages award.

350.    In short, Plaintiff has been deprived of claims, as well as the ability to fully investigate her existing claims, and the City knew to a moral certainty this would be the result of maintaining its policies, yet did nothing to change them.

351.    NYPD also fails to provide timely and correct body-worn camera (BWC) footage in response to alleged misconduct of its officers during protests. While in several instances, this was because individual officers failed to turn on their BWCs in situations mandated by the NYPD Patrol Guide or because the batteries in the BWCs lost their charge because of the duration of the protest deployment, NYPD systematically condones or fails to correct such

behavior upon sufficient notice, and assists such behavior by withholding footage from CCRB investigators.[60]

352.    For example, in CCRB Cases Nos. 202005478, 202004729, and 202006194, the NYPD turned over body camera footage that was either incorrect or irrelevant, wasting the time of investigators. In CCRB Cases Nos. 202003782, 202004183, 202004586, 202004002, and 202003731, the NYPD reported that queries for requested video footage could not be found, but the footage was later discovered through a different means. In CCRB Cases No. 2020038897, 202003969, 202004315, 202003782, and 202004183, the NYPD gave inconsistent responses, as the NYPD found the video footage responsive to multiple CCRB requests, but only sent that footage in response to some but not all pending requests.[61]

353.    Nominally, none of that should be an issue.

354.    Under Patrol Guide § 212-123, whenever an officer is engaged in any stop or arrest at a protest, they *must* activate their BWC.

355.    Moreover, if an officer *does not* do so, they are required to notify a supervisor, and document that notification in their Activity Log.  *See* Patrol Guide § 212-123(5).

356.    Yet, systemically, NYPD officers routinely fail to follow these procedures at protests, with no consequence.

357.    For example, Defendants Nin, Sehl, and Cunningham all violated both Patrol Guide § 212-123(4) and (5).

358.    Yet, none of these Defendants have faced any discipline for that action.

---

[60] Ibid., p. 16.
[61] Ibid.

359.     Moreover, the DOI Report exposes challenges in accessing NYPD records. According to the report, NYPD historically has not and still does not respond to oversight agencies' requests with appropriate speed, openness, or alacrity. There is a fivefold increase over the past two years in the average time it takes for the NYPD to release body-worn camera footage.

**L. Defendants' Failure to Monitor And Supervise NYPD Members' Protest Policing**

360.     Although defendants City, Shea, Monahan, Lehr and other policymakers actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged, or observed such conduct.

361.     For example, despite statements made by Mayor de Blasio and Commissioner Shea in the media indicating they had knowledge of events related to violence and mass arrests at the protests as they were unfolding, and the wealth of video and other evidence that has been widely available in their intervening months, upon information and belief, virtually no NYPD members have need meaningfully investigated or disciplined related to their conduct.

**M. Some Reports and Investigations into the 2020 Protests**

362.     In July 2020, the New York State Office of the Attorney General ("the AG") issued a preliminary report on the NYPD's response to the May and June protests ("the AG Report"). [62]

---

[62] New York State Office of the Attorney General, Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd, ("AG Report"), July 2020, available at http://ag.ny.gov/sites/default/files/2020-nypd-report.pdf. The Plaintiffs herein incorporate by reference into this case the facts set forth in the AG Report.

363.     The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observes, elected officials, and essential workers.

364.     The AG Report also found the pervasive use and misuse of tightly fastened flex-cuffs during arrest, NYPD officials covering their badge numbers, and failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

365.     In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[63]

366.     The DOI Report found, inter alia, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[64]

367.     In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[65]

---

[63] Margaret Garnett, Commissioner, New York City Department of Investigation, Investigation into NYPD Response to the George Floyd Protests, ("DOI Report"), Dec 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20GerogeFloyd%20Protests.12.18.2020.pdf
[64] Id. at 36.
[65] Id. at 61.

368.    The DOI found that NYPD policies do not have specific First Amendment protest expression policing and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

369.    The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

370.    The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

371.    According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[66]

372.    The DOI also found that Black arrestees were disproportionately charged with felonies.[67]

373.    The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swatch of people who had no apparent connections to that potential criminal activity.[68]

374.    According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[69]

375.    Defendant City and NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to respond to the Summer 2020 Protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

---

[66] Id. at 26.
[67] Id. at 27.
[68] DOI Report at 56.
[69] Id. at 28.

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

376.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

377.   Defendants did not have probable cause to seize, detain, or arrest Plaintiffs.

378.   Defendants seized Plaintiffs without a written judicial warrant authorizing them to do so.

379.   Defendants' seizure of Plaintiffs was without privilege or lawful justification.

380.   Plaintiffs did not consent and were conscious of the confinement by Defendants.

381.   As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

382.   Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

383.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

384.   Defendants' use of force against Plaintiffs was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

385.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

386.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### THIRD CLAIM FOR RELIEF

**For Violations of Plaintiff's First Amendment Rights,
Including Under Retaliation and Time/Place/Manner Theories of Liability**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First
and Fourteenth Amendments to the United States Constitution*

387.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

388.     Defendants retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment.

389.     Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

390.     Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

391.     Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

392.     Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiffs to violations of their First Amendment rights.

393.     Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

394.     Defendants imposed restrictions on Plaintiffs' protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in subjecting Plaintiff to excessive force, false arrest, excessive detention, malicious and false prosecution, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

395.     Furthermore, by concealing their identities through individual and systematic tactics including covering up badge numbers, withholding body camera footage, and not tracking the whereabouts of deployed officers, Defendants interfered with the Plaintiffs' abilities to exercise their First Amendment rights to protest, as a preemptive retaliation by deliberately making it difficult for protestors to assert their First Amendment rights.

396.     This practice intends to prevent, and at a minimum even when cured, delays, Plaintiff and those like her from being able to identify and seek legal redress from the officers who directly engaged in the violation of the Plaintiff's First Amendment rights through the aforementioned means, such as excessive force and false arrest.

397.     If a right cannot be defended and litigated in court, it exists in name only.

398.     Defendant's concealment of officer identities and failure to track thus imposes a chilling effect of suppressing First Amendment protests.

399.     Defendants imposed restrictions on Plaintiffs' protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in subjecting

Plaintiff to excessive force, false arrest, excessive detention, malicious and false prosecution, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

400.    In addition to being retaliatory, the restrictions Plaintiffs complained of herein that Defendants imposed on Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiffs' protected conduct that:

    a.    Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

    b.    Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

    c.    Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's ability to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

    d.    Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

401.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

402.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

**Due Process**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution***

403.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

404.    As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

405.    Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiffs' property and/or detaining Plaintiffs in the conditions as described subjected Plaintiffs to the violations of their Due Process rights described elsewhere herein.

406.    Additionally, as described above, Defendants' actions prevented Plaintiff from ascertaining the identities of those who violated her rights, and delayed identification of others.

407.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

408.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Equal Protection and Selective Enforcement
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fourteenth Amendment to the United States Constitution***

409.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

410.     As described above, in many cases, Defendants arrested Plaintiffs for alleged offenses in connection with which C.P.L. § 150.20 required that Plaintiffs receive summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

411.     However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, rather than issuing them summonses, and releasing them from custody, on the street, while Defendants did not apply those same Protest Arrest Processing Policies to other similarly situated arrestees.

412.     Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and/or detaining and/or prosecuting Plaintiffs subjected Plaintiffs to the above-described violations of Plaintiffs' Equal Protection rights.

413.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

414.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

### Deprivation of Fair Trial Rights
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution***

415.     Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

416.     Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiffs suffered liberty deprivations and other injuries.

417.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

418.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SEVENTH CLAIM FOR RELIEF

### Malicious Prosecution

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution*

419.    Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

420.    Upon information and belief, Defendants misrepresented and falsified evidence to the prosecutor and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence - to the prosecutor.

421.    Defendants were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiffs, including by supplying and creating false information to be included in NYPD paperwork that was included in NYPD paperwork, providing falsely sworn information in accusatory instruments, and/or providing false information to the prosecutor.

422.    Defendants lacked probable cause to initiate and continue criminal proceedings against Plaintiffs.

423.    Defendants acted with malice in initiating criminal proceedings against Plaintiffs.

424.    Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiffs were favorably terminated on the merits.

425.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

426.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## **EIGHTH CLAIM FOR RELIEF**

**Municipal Liability**
*Pursuant to 42 U.S.C. 1983 and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978)*
*for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth*
*Amendments to the United States Constitution*

427.    Plaintiffs incorporate by reference the allegations set forth in all preceding and

following paragraphs as if fully set forth herein.

428.    The facts pleaded above describe the policies, practices, and customs Defendants

subjected the Plaintiffs to, including, but not limited to: uses of excessive force, and false arrests,

and unreasonable restrictions on protesters' First Amendment-protected conduct, often without

fair warning; employing crowd control tactics such as pushing, corralling, encircling, or

otherwise trapping protesters, without fair warning; engaging in retaliatory and selective

enforcement of the criminal laws against perceived participants in First Amendment assemblies,

particularly Black Lives Matter and/or anti-police brutality protests, in the absence of adequately

clear standards to guide police officials' extremely broad discretion to arrest anyone at their

whim, based on *ad hoc* determinations as to their perceived violations, without fair warning;

using flex-cuffs for protest-related arrests, while failing to supply officers with protective

padding and adequate numbers of cutting tools to loosen or remove flex-cuffs, and/or to ensure

that such cutting tools are readily available when needed; failing to loosen or remove over-tight

cuffs; subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at

centralized arrest processing locations, exposing them to searches, property seizures, and

unhealthy and conditions of confinement, in lieu of brief street detentions; condoning and in

some cases assisting officers in the concealment of identities by covering badges or other visual

identification information, by failing to track the whereabouts and assignments of officers and

equipment, and by failing to capture and provide correct and timely body camera footage in response to dispositive requests.

429.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant de Blasio, Defendant Shea, and Defendant Monahan; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendant de Blasio, Defendant Shea, Defendant Monahan, and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

430.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

431.    Defendant City's customs and *de facto* policies and specifically relating condoning and in some cases assisting officers in the concealment of identities by covering badges or other visual identification information, by failing to track the whereabouts and assignments of officers and equipment, and by failing to capture and provide correct and timely body camera footage in response to dispositive requests have deprived Plaintiff of her claims

against specifically Defendants Doe 84 and Doe 85, including the punitive damages she would have asserted against them.

432.     As further set out above, Defendant City had actual knowledge to a moral certainty that its policies and customs will result in people like Plaintiff being deprived of those causes of actions, and maintains the policies and customs despite – and perhaps because of – that effect.

433.     Thus, Plaintiff's measure of damage specifically on that theory includes the punitive damages that **would have** been available against Does 84 and 85.

434.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### NINTH CLAIM FOR RELIEF

**Violations of New York State Law**
***Pursuant to the New York State Constitution and New York State Law***

435.      Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

#### *Respondeat Superior* **Liability**

436.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

#### **Assault**

437.    Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

**Battery**

438.    Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

**Conversion**

439.    Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiffs' personal property in derogation of Plaintiffs' rights.

**False Imprisonment and Unreasonable Detention**

440.    By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so.

441.    Plaintiffs were conscious of the confinement and it was without their consent.

**Negligent Hiring, Training and Supervision**

442.    Upon information and belief, Defendant City supervised, and trained the police officials described above.

**Excessive Detention**

443.    Defendants deliberately detained Plaintiffs for excessive and unreasonably prolonged periods of time.

**Malicious Prosecution**

444.     Defendants commenced criminal proceedings against Plaintiffs maliciously and without probable cause.

445.     All charges were terminated in Plaintiffs' favor.

**Violations of the New York State Constitution**

446.     Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

447.     Plaintiffs were deprived of their rights to due process as guaranteed by the Art. I, § 6 of the New York Constitution. Plaintiffs were deprived of their rights by New York failing to track officers, and allowing officers to cover badge numbers. These policies are intended to and have the effect of limiting judicial relief. We urge the court to declare the policies of failing to track and covering badge numbers unconstitutional under the New York Constitution.

448.     Plaintiffs were deprived of their right to freedom of speech as guaranteed by Art. I, § 8 of the New York Constitution. Plaintiffs were deprived of their ability to engage in protected speech in a public forum. These deprivations were not reasonable restrictions on speech. The policy of covering badge numbers and not tracking the NYPD officers while officers disrupt protests is intended to and does chill speech.

449.     Plaintiffs were deprived of their rights to peacefully assemble and petition the government as guaranteed by Art. I, § 9 of the New York Constitution. Plaintiffs' were deprived of their rights to peacefully assemble and petition the government because of being violently dispersed without cause. Furthermore, the policies of covering badge identifications and failing to track officers, thus obfuscating the identification of officers, while officers disrupt protests intends to chill and does chill protests.

450.    Plaintiffs were deprived of their rights to equal protection as guaranteed by the Art. I, § 11 of the New York Constitution.

451.    Plaintiffs were deprived of their rights to be free from unreasonable search and seizure as guaranteed by Art. I, § 12 of the New York Constitution. Additionally, the policy of covering of badges while officers are engaging in use of force violates Plaintiffs' rights guaranteed by Art. I, § 12 of the New York Constitution. Officers lacked probable cause or exigent circumstances to search and arrest plaintiffs. Officers also engaged in violent, unnecessary tactics against protestors without cause.

452.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

453.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

454.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## **DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## **DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiff demands judgment against the individual Defendants and the City of New York as follows:

i.    Actual and punitive damages against the individual Defendants in an amount to be

determined at trial;

ii.      Actual damages (including, as set out above, the measure of punitive damages that would have been available against Defendant Does 84 and 85) in an amount to be determined at trial against the City of New York;

iii.     Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988, and New York common law; and

iv.     Such other relief as the Court deems just and proper.


Dated:  New York, New York
             November 3, 2023

**GIDEON ORION OLIVER**


_____
277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com


**COHEN&GREEN P.L.L.C.**


By:  _____
Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
    t: (929) 888-9480
    f: (929) 888-9457
    e: elena@femmelaw.com
        remy@femmelaw.com
     jessica@femmelaw.com